# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

DONNA DUNN                                                                PLAINTIFF

V.                                  4:06CV0531 JMM

OFFICE OF PERSONNEL MANAGEMENT                    DEFENDANT

## AMENDED ORDER

Plaintiff, Donna Dunn, seeks judicial review pursuant to the Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. § 8901, *et seq*. of the decision by the defendant Office of Personnel Management ("OPM") denying plaintiff reimbursement for a medical procedure. Pending is plaintiff's motion for judgment on the record. The defendant has responded. For the reasons set forth below, the Court finds for the plaintiff.

1. *Factual Background*

Plaintiff is a member of the insurance plan provided by the National Association of Letter Carriers ("NALC"). The NALC is an employee organization as defined and governed by 5 U.S.C. § 8901(8). NALC provides health insurance to federal employees and their families. OPM is a federal agency and one of its duties is the administration of the Federal Employees Health Benefits Act ("FEHBA").

Plaintiff suffers from obesity. Plaintiff tried numerous treatments and diets in an attempt to reduce her weight. Some of the treatments resulted in short term weight loss but ultimately failed, oftentimes with plaintiff gaining more weight than she lost. As a result of being overweight, plaintiff suffers from high blood pressure, hypertension, orthopedic problems and hypercholesterolemia. Plaintiff consulted with Dr. Jaime Ponce, a bariatric surgeon, at the Hamilton Medical Center in Dalton, Georgia. Dr. Ponce found plaintiff to be 5' 8 ½ " tall,

weighing 241 pounds, with a Body Mass Index ("BMI") of 36.1 and suffering from comorbidities of hypertension, severe arthropathy and gastroesophageal reflux.  Plaintiff was taking medications for these conditions and there is a familial history of comorbid conditions.

Ponce also noted that plaintiff had been in this condition for more than five years and had tried to lose weight under physician-supervised weight programs for several years without success.  Based on these findings, Ponce decided plaintiff was morbidly obese and, therefore, an appropriate candidate for a LAP-BAND procedure.  Dr. Ponce submitted a request for preauthorization to the NALC Health Benefit Plan ("Plan") on plaintiff's behalf.  (R at 3-6.)

On March 21, 2003, the Plan denied the request and stated plaintiff did not meet the criteria for the LAP-BAND procedure as described on page 34 of the plan brochure.  The Plan states as follows:

> ......for treatment of morbid obesity-a condition in which an individual weighs 100 pounds or 100% over his or her normal weight with complicating medical conditions and attempts to reduce weight using a doctor-monitored diet and exercise program were unsuccessful; Patient must be 18 or older.  (R. at 469).

On March 26, 2003, plaintiff appealed the Plan's denial.  Plaintiff asserted that the National Institute of Health (NIH) and the American Medical Association (AMA) criteria for obesity management is a BMI of 35 or greater with co-morbidities.  Plaintiff provided a letter from her gynecologist, Dr. Holly Cockrum, asking that the Plan reconsider it's decision because plaintiff met the NIH and AMA criteria.  (R. at 8.)  Plaintiff also provided FDA pre-market approval of the LAP-BAND, medical records and professional articles about the procedure.  (R. at 14-53.)  On April 2, the Plan again denied pre-authorization for the procedure for a different reason, stating that it was "investigational/experimental and/or not considered to be clinically

2

effective."

On April 16, 2003, plaintiff responded with an appeal letter to the NALC Plan providing proof again that the procedure was FDA approved and not experimental or investigational. Plaintiff relayed her plans to proceed with the surgery on April 30, 2003, and seek reimbursement from the Plan.

On May 8, 2003, the Plan explained why they denied plaintiff's request for reconsideration. The Plan stated that the LAP-BAND procedure had been approved by the FDA, but "remains investigational/experimental", and that:

> In addition, the patient did not meet the criteria listed on page 34 of the brochure. Documentation submitted state her BMI as 36.1. The BMI calculator for the American Society of Bariatric Surgery gives a BMI of 34.97. Neither indicates morbid obesity. Neither Dr. Ponce from Surgical Weight Management @ Hamilton Medical Center or Dr. Cockrum, the referring physician, indicate the patient is 100 lbs. Or 100% overweight. Also, please note our March 21, 2003 denial stating that the patient did not meet the criteria was not challenged or questioned by Dr. Ponce. We were also notified in a telephone call to Angie @ Weight Management office (ph#706-272-6668) on March 18, 2003, that Donna Dunn's ideal weight is 200 lbs. (R. at 261-263.)

On May 15, 2003, OPM notified plaintiff that OPM's independent medical consultant, Dr. Harry Sax, needed additional medical information in order to evaluate plaintiff's claim. The physician requested the following: history, physical, other medical records from her primary care physician for the period from November 1, 2002 to April 30, 2003; similar records from specialists; and documents relative to physician-monitored diet and exercise programs. (R. at 513-514.)

On June 4, 2003, plaintiff responded to this request by supplying the additional medical records requested by Dr. Sax. Included was a two-year old letter from a Dr. Beland that said the

plaintiff was "moderately overweight" and weighed 224 lbs. Also included were records from the University of Arkansas For Medical Sciences Medical Center Weight Control Program where the plaintiff responded that she would be comfortable in maintaining a weight of 195-200 lbs. (R. at 80.) Finally, the court notes that included in the records for the time period requested by OPM is a report from Dr. Gerald Silvoso of the Little Rock Diagnostic Clinic that lists plaintiff's weight November 14, 2002, at 247 lbs. (R. at 104-105.)

On June 13, 2003, OPM requested that its medical consultant review plaintiff's claim to determine 1) if she met the criteria in the Plan Brochure for obesity surgery; 2) whether the LAP-BAND procedure is consistent with the standards of good medical practice in the United States; and, 3) was it medically necessary to treat plaintiff's condition. (R. at 336.)

The Plan Brochure defines "medical necessity" as:

Service, drugs, supplies or equipment provided by a hospital or a covered provider of the health care services that we determine:
- Are appropriate to diagnose or treat your condition, illness or injury;
- <u>Are consistent with standards of good medical practice in the United States;</u>
- Are not primarily for personal comfort or convenience of you, your family, or your provider;
- Are not related to your scholastic education or vocational training; and
- In the case of impatient care, cannot be safely provided on an outpatient basis.

(R. at 263, 500.) (emphasis added).

In his June 23, 2003, report Dr. Sax stated:

The patient is a 39-year old female with a BMI of 36 and actual body weight of 242 pounds. Ideal body weight for a 5' 8.5" female is 145 pounds.....A Gastric lap Banding procedure has been requested. The patient does not meet the NALC criteria for obesity surgery as she is not 100 pounds or 100% of her normal weight. Further, while Lap banding is FDA approved, it mimics the vertical band gastroplasty that has fallen out of favor due to high rates of reflux and worse weight control. (Sarr, et al.J.Gastroint Surg). (R. at 332-334.)

4

Dr. Sax concluded that the plaintiff did not meet the NALC brochure criteria for obesity surgery and that the "[a]djustable Laparoscopic Gastric Band (Lap- Band) CPT Code 43843 has fallen out of favor in the United States and therefore cannot be considered to meet good standards of medical practice." (R. at 332.)

On December 2, 2005, plaintiff requested that OPM provide her with the entire file related to her claim, which OPM provided on January 12, 2006. On January 11, plaintiff wrote OPM and said she knew that she had the option to file suit in federal court but she preferred to resolve it without doing so. She provided additional information regarding the claim and asked OPM to reopen the claim. OPM denied this request.

2. *Standard of Review*

OPM is a federal agency that has the responsibility for administering the FEHBA. FEHBA provides for judicial review of benefit denial decisions by OPM. See 5 C.F.R. § 890.105 (1992). The District Courts have jurisdiction over FEHBA claims pursuant to 5 U.S.C. § 8912 and 5 C.F.R. 890.107. *Empire Healthchoice Assn., Inc. V. McVeigh*, 126 S.Ct. 2121, 2124 (2006). Benefit provisions are rules under the Administrative Procedure Act, 5 U.S.C. § 551(4). The standard of review by a court on an administrative agency's interpretation of a rule is to ". . .hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . . ." 5 U.S.C. § 706(2)(A). *see also, Nesseim v. Mail Handler's Ben. Plan,* 995 F2d 804, (8th Cir. 1993); *Muratore v. U.S. Office of Personnel Management*, 222 F.3d 918 (11th Cir. 2000); *Falk v. U.S. ex rel. Dept. of Interior*, 452 F.3d 951 (8th Cir. 2006).

5

In *Falk*, the Eighth Circuit held that the arbitrary and capricious standard is a narrow one:

> Its scope is more restrictive than the "substantial evidence" test which is applied when reviewing formal findings made on a hearing record. "Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis." Something more than mere error is necessary to meet the test. To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case[.]" 736 F.2d at 1240 (citations omitted). "Similarly, we accord substantial deference to an agency's interpretation of its own regulation, which we are bound to uphold unless it violates the Constitution or a federal statute, or unless the interpretation is plainly erroneous or inconsistent with the regulation." *Coalition For Fair & Equitable Regulation of Docks on Lake of the Ozarks* v. F.E.R.C., 297 F.3d 771, 778 (8th Cir.2002) (citation and internal quotations omitted).

*Falk, at 953*; *see also Bradley v. Bureau of Alcohol, Tobacco, & Firearms*, 736 F.2d 1238, 1240 (8th Cir. 1984); *see Bowman Transportation, Inc. V. Arkansas-Best Freight Systems*, 419 U.S. 281, 285 (1974).

In a case involving OPM, the Fourth Circuit stated that "[a] district court defers to OPM's interpretation of health benefit contracts unless 'plainly erroneous or inconsistent with the regulation.'". *Caudill v. Blue Cross and Blue Shield of North Carolina*, 999 F2d 74, 80 (4th Cir.1993), quoting *Meyers v. U.S.* 767 F.2d 1072, 1074 (4th Cir. 1985)(citation omitted). "In making the foregoing determinations, the court shall review the whole record those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." *Muratore,* at 923. The Eleventh Circuit concluded, "OPM's expertise justifies deference in this case. 'Deference, of course, does not mean abdication of careful judicial review.'" *Muratore* at 923, quoting *Northwest Pipeline*, 61 F.3d 1479, 1486 (10th Cir.1995). "We will defer to OPM's interpretation as long as that interpretation is reasonable and relies on ample factual and legal support. *Muratore*, at 923.

In *Olenhouse v. Commodity Credit Corp*., 42 F.3d 1560, 1574 (10th Cir.1994), the Court found:

> The duty of a court reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 [103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443] (1983). In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment. *Id*. (citing *Overton Park [v. Volpe]*, 401 U.S. [402] at 416 [91 S.Ct. 814 at 823-24, 28 L.Ed.2d 136] [ (1971) ]. Agency action will be set aside if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2867.

The Tenth Circuit has held that "'When an agency relies on a number of findings, one or more of which are erroneous, we must reverse and remand only when there is a significant chance that but for the errors the agency might have reached a different result'", *Mount Evans v. Madigan*, 14 F.3d 1444, 1456 (10th Cir. 1994), quoting *National Parks and Conservation Ass'n v. FAA*, 998 F.2d 1523, 1533 (10th Cir.1993).

3. *Discussion*:

After the Plan first denied plaintiff's benefits because she failed to meet the criteria, it next denied the requested benefits because it found the procedure to be "investigational/experimental and/or not considered to be clinically effective" and did not list her failure to meet the weight criteria. The Plan later acknowledged the LAP-BAND was not investigational or experimental. The two final reasons OPM gave the plaintiff for denying her claim were that the reviewing physician, Dr. Sax, concluded that 1) plaintiff did not meet the

7

NALC brochure criteria for obesity surgery and 2) the "[a]djustable Laparoscopic Gastric Band (Lap- Band) CPT Code 43843 has fallen out of favor in the United States and therefore cannot be considered to meet good standards of medical practice."

In first addressing the issue of meeting the criteria, the court notes that OPM only disputes that the plaintiff did not meet the weight requirement necessary to justify the procedure. Plaintiff met the other elements of the Plan which included many complicating medical conditions and failure of physician monitored attempts to lose weight by diet and exercise for over five years. The criteria according to the Plan for gastric bypass or stapling was that plaintiff must be "100 lbs. or 100% over her normal weight". Dr. Sax determined that plaintiff's ideal weight is 145 based on her height. How Dr. Sax reached this conclusion is not in the record. The Plan does not detail how "100 lbs. or 100% over normal weight" is to be determined. Oddly, the Plan called Dr. Ponce's office on March 18, 2003 and asked "Angie", a receptionist, what the plaintiff's ideal weight was which she said was 200 pounds. The court, however, does not consider the receptionist's opinion in reaching its' decision because of her obvious lack of medical expertise compared to the OPM's own physician and the two treating physicians.

In reviewing the record, the court notes that Dr. Sax specifically asked for the plaintiff's medical records, including records from specialists, from November 1, 2002 to April 30, 2003. In the requested records for the specified time period with which Dr. Sax was concerned was a report from Dr. Gerald Silvoso which clearly showed that plaintiff's weight was 247 pounds on November 14, 2002. The plaintiff, therefore, weighed 102 pounds over her normal weight, surpassing the Plan's criteria within three and a half months (3.5) of her request for preauthorization for the procedure. As does anyone's weight fluctuate daily/monthly, so did the

8

plaintiff's as revealed throughout the record.

In addition, the plaintiff's two treating physicians, Drs. Ponce and Cockrum both stated that plaintiff had a BMI of 36.1 and co-morbidities. Both doctors looked at the NIH and AMA guidelines to determine that her BMI, presence of comorbidities, the fact that she had been overweight for five years, and had unsuccessfully attempted to lose weight through physician monitored weight loss and exercise programs qualified plaintiff as "morbidly obese". OPM points to the fact that the Plan does not address BMI factors and that it does not have to adhere to NIH and AMA guidelines. Interestingly, although the plan is devoid of any guidance as to what makes someone 100 pounds or 100 % overweight, two of the three articles cited by the plan's own reviewing physician state that patients are eligible for surgery and are considered morbidly or severely obese if they have failed attempts at non-surgical weight loss and have a BMI of 35 or more with comorbidy. The third article cited by Dr. Sax refers to BMI numbers in its' data.

In reviewing the entire record, the Court notes the prejudicial error in finding the plaintiff did not meet the weight requirement. OPM'S decision was arbitrary and capricious because the record clearly does not support the denial of benefits based on plaintiff's weight. The Court may set aside such an administrative action where it is not supportable on any rational basis. *Falk* at 953. Without examining plaintiff or providing any basis for his determination, Dr. Sax decided that her ideal weight is 145 pounds based on her height. Even though Dr. Sax's determination of 145 pounds is ambiguous at best, plaintiff was 102 pounds overweight three months before she requested preauthorization for her surgery, a time period for which OPM had requested plaintiff's medical records. In addition, two treating physicians, the NIH, the AMA and two articles submitted by OPM's reviewing physician assert that plaintiff was morbidly obese and a candidate

9

for the LAP-BAND procedure based on her weight and other factors. OPM's interpretation was not reasonable because there was ample factual support in the record to conclude she was 100 pounds overweight by the plan's criteria and morbidly obese. *Muratore* at 923.

In addressing OPM'S second reason for denial, OPM claims that the LAP-BAND procedure does not meet "good standards of medical practice in the United States" based on the opinion of its' reviewing physician, Dr. Sax. Dr. Sax claims to base his opinion on three different articles as follows: Robert E. Brolin, M.D., *Bariatric Surgery and Long-term Control of Morbid Obesity*, 288 No. 22 Journal of the American Medical Association 2793 (2002); Barry L. Fisher, M.D. and Philip Schauer, M.D., *Medical and Surgical Options in the Treatment of Severe Obesity,* 184 American Journal of Surgery 9S-16S, (2002); and, an abstract of Bruno M. Balsinger, M.D., Juan L. Possio, M.D., Jane Mai, R.N., Keith Kelly, M.D., and Michael G. Sarrr, M.D., *Ten and More Years After Vertical Banded Gastroplasty as Primary Operation for Morbid Obesity*, Vol.4, Issue 6 Journal of Gastrointestinal Surgery 598-605 (Nov.-Dec. 2000). Although not provided by OPM or the plaintiff, the court obtained copies of these articles that the reviewing physician referenced and are cited by Dr. Sax in the record to see if they stated that the LAP-BAND did not meet good standards of medical practice.

After a review of the articles the court agrees with Dr. Sax in his finding that the vertical band gastroplasty (VBG) has fallen out of favor. The court, however, finds the articles completely lacking in any comparison between the VBG and the LAP-BAND, other than they are both procedures that restrict food intake. It appears the LAP-BAND procedure had not "fallen out of favor" as did the VBG, it merely had not been attempted before 2001 in the United States and was still in its infancy in this country in 2003. According to the articles, the difference is that

the VBG is fixed and nonadjustable as opposed to the LAP-BAND.

None of the articles state that the LAP-BAND procedure "mimics" the VBG, as opined by Dr. Sax. To the contrary, the two articles written after the LAP-BAND procedure obtained FDA approval state that the procedure is not new and is the most commonly performed bariatric operation outside the United States. The Fisher/Schauer article projects that the "[a]djustable gastric banding systems - - the LAP-BAND . . . and others –allow for fine adjustments of the outlet, diameter, which may offset the disadvantages of a fixed, nonadjustable outlet " which is the VBG procedure.

The third article by Balsinger or Sarr (Sax used Sarr's name in the text of his opinion and Balsinger's name as the reference), was referenced by Sax as an abstract, written in 2000, a year before the LAP-BAND procedure obtained FDA approval. The abstract contains no mention of a LAP-BAND procedure. The record does not say that Dr. Sax ever actually read the full text of Sarr's article which was never published in the journal referenced. However, the full text of the article obtained by the court is mainly about the VBG and at the end states that they "remain skeptical" about the LAP-BAND procedure and that some results indicate "complications comparable to those of VBG" . . . [o]ther results, however, appear quite encouraging." The article goes on to state that "[i]f the laparoscopic equivalent of this procedure (laparoscopic banding) will produce better long-term results due to the lack of a staple line (that can disrupt) and adjustability of the stoma is questionable." The Balsinger/Sarr's article noted that studies are underway. The article never asserts that the LAP-BAND "mimics" the VBG or that it does not meet good standards of medical practice in the United States.

The record includes proof that the LAP-BAND received FDA approval in 2001. The

11

court, however did not consider the favorable articles provided by plaintiff regarding the LAP-BAND's continued acceptance that were not in the record on June 30, 2003, when the OPM rendered its' final decision. 5 C.F.R. 890.107(d)(3). The court finds that the reviewing physician's findings are not supported by the articles he uses as the basis for those findings and he offered an explanation for his "decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs*., 463 U.S. 29, 43 (1983). Dr Sax provides no other proof to support his finding that the LAP-BAND is procedure does not meet "good standards of medical practice in the United States" and, therefore his conclusion is not supported by any rational basis and clearly erroneous. *Falk* at 953, *Bradley* at 1240; *Bowman Transportation, Inc*. at 283.

"When an agency relies on a number of findings, one or more of which are erroneous, we must reverse and remand only when there is a significant chance that but for the errors the agency might have reached a different result." *National Parks and Conservation Ass'n v. FAA*, 998 F.2d 1523, 1533 (10th Cir. 1993). *Mount Evans* at 1456. Certainly if Dr. Sax had acknowledged plaintiff was over 100 pounds overweight according to the records he requested and had comprehended the plain language of the articles he sited as references concerning the LAP-BAND procedure, OPM would have granted plaintiff's preauthorization request.

For these reasons, the Court finds that OPM's decision to deny plaintiff's request for the LAP-BAND procedure to treat her morbid obesity was arbitrary and capricious. Plaintiff is entitled to reimbursement for her LAP-BAND procedure and all subsequent visits to evaluate and continue treatment, although the case is remanded to the OPM to determine the precise amount of benefits due to plaintiff.

Any award of attorney fees is premature. Pursuant to the Equal Access to Justice Act

("EAJA"), 28 U.S.C. § 2412 the court is required to award attorney fees to prevailing, non-government parties in civil actions brought by or against the United States, "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412 (2)(d)(1)(A). Plaintiff must submit an application to the court "within thirty days of final judgment in the action." for attorney fees and expenses. 28 U.S.C. § 2412 (d)(1)(B). *Bryan v. Office of Personnel Management*, 165 F.3d 1315 (10th Cir. 1999); *see Huntsman Farms, Inc. v. Epsy*, 928 F.Supp. 1451 (8th Cir. 1996).

IT IS SO ORDERED this 9 day of April, 2007.

_____
James M. Moody
United States District Judge